STATE OF NORTH CAROLINA v. EL AMIN AHMAD ALI

No. 107A88

(Filed 14 August 1991)

1. **Constitutional Law § 313 (NCI4th)— attorneys' advice to exercise peremptory challenge—defendant allowed to refuse— effective assistance of counsel**

Defendant was not denied effective assistance of counsel where the trial court and defendant's attorneys allowed him to make the decision not to peremptorily challenge a juror his attorneys had wanted to remove, since defendant was fully informed but he wished to accept the juror anyway; in accord with the principal-agent nature of the attorney-client relationship, the client's wishes had to control; and the attorney made a record of the circumstances, her advice to defendant, reasons for the advice, defendant's decision, and the conclusion reached.

STATE v. ALI

[329 N.C. 394 (1991)]

**Am Jur 2d, Criminal Law §§ 967 et seq.**

**Adequacy of defense counsel's representation of criminal client regarding right to and incidents of jury trial. 3 ALR4th 601.**

2. **Constitutional Law § 344 (NCI4th)— bench conferences with prospective jurors—jurors excused—defendant's right to be present not violated**

The trial court's conduct in excusing two prospective jurors did not deprive defendant of his constitutional right to be present at every stage of the proceeding where the trial court reconstructed the substance of bench conferences with the prospective jurors for the record and, before ruling, gave defendant an opportunity to be heard; in each instance defendant did not make further inquiry as to the verbatim context of the conversation and did not object to the trial court's action, even though specifically given the opportunity to do both; and with defendant present his counsel consented to the jurors being deferred or excused.

**Am Jur 2d, Criminal Law §§ 908, 909, 914.**

3. **Jury § 6.4 (NCI3d)— capital punishment as deterrent—question not allowed during jury selection—no error**

The trial court did not err during jury selection by preventing defendant from asking all prospective jurors if they believed that capital punishment was a deterrent to crime, since neither defendant nor the State can introduce evidence or argue the effect, if any, of the death penalty on the commission of crimes by others.

**Am Jur 2d, Jury §§ 202, 203, 289.**

**Comment Note—Beliefs regarding capital punishment as disqualifying juror in capital case—post-Witherspoon cases. 39 ALR3d 550.**

4. **Criminal Law § 73.2 (NCI3d)— murder victim's statements to pastor—admissible hearsay**

Statements by a murder victim to her pastor were not inadmissible under the hearsay rule, since the pastor-parishioner relationship is recognized as one attended by trust and confidence; there was plenary evidence that the victim's motivations for speaking with the witness were concern for her own

safety and the need for advice as to how to deal with defendant; and the circumstances and the nature of the information the victim related to the witness caused the trial court to conclude that the victim's statements possessed sufficient guarantees of trustworthiness. N.C.G.S. § 8C-1, Rule 804.

**Am Jur 2d, Evidence § 496; Homicide § 330.**

5. **Criminal Law § 73.2 (NCI3d)— murder victim's statements to friend—trustworthiness—admissible hearsay**

Statements by a murder victim to her friend were sufficiently reliable and trustworthy to be admitted as an exception to the hearsay rule where the victim and the witness had a close relationship and talked to each other on numerous occasions regarding many subjects; the particular conversation in question was a confidential one which the victim asked the witness not to share with anyone; the victim had personal knowledge of the events she related to the witness; her motivation was fear of defendant; the statement to the witness was virtually identical to the one the victim gave to her pastor; and information in the victim's statement was subsequently corroborated by defendant's statements to police. Moreover, notice of the statement given to defendant eleven days before trial, though it did not include all of the victim's statements as described by the witness at trial, was sufficient to inform defendant of the substance of the victim's statements and thereby to afford defendant a fair opportunity to meet the State's evidence.

**Am Jur 2d, Evidence § 496; Homicide § 330.**

6. **Appeal and Error § 359 (NCI4th); Criminal Law § 463 (NCI4th)— jury argument based on photo—failure to include photo in record—error not shown**

Defendant did not show that the trial court in a murder prosecution committed reversible error when it failed to intervene *ex mero motu* during the prosecutor's closing argument, since defendant did not bring forward in the record on appeal a photograph on which part of the allegedly improper argument was based, and other evidence supported the prosecutor's arguments that the female victim watched her husband die and that defendant watched both victims as he emptied his gun.

**Am Jur 2d, Trial § 219.**

7. **Criminal Law § 433 (NCI4th) — jury argument — defendant referred to as animal — no prejudicial error**

Defendant failed to show prejudicial error in the trial court's overruling of his objection to the prosecutor's reference to defendant as an "animal," since the prosecutor made one isolated remark, and the evidence of defendant's guilt was overwhelming.

**Am Jur 2d, Trial §§ 274, 304.**

**Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial — modern cases. 88 ALR4th 8.**

8. **Criminal Law § 53.1 (NCI3d) — first degree murder — medical examiner's opinion — admissibility**

The trial court in a murder prosecution did not err by allowing the prosecutor to elicit from the medical examiner his opinion that one of the shots fired into one victim's body had been inflicted after the victim had fallen, and any question as to movement of the body or failure to preserve the integrity of the crime scene went to the weight to be given the pathologist's opinion, not its admissibility.

**Am Jur 2d, Homicide §§ 398 et seq.**

9. **Homicide § 18.1 (NCI3d) — pain of murder victim — admissibility of testimony**

In a first degree murder prosecution the trial court did not err by admitting over defendant's objections expert and lay testimony concerning the pain experienced by the female victim during her last moments of life, since such evidence was admissible to establish that defendant acted with malice, premeditation and deliberation, and to show the trustworthiness of the victim's statement to police immediately after the shooting in which she named her assailant.

**Am Jur 2d, Homicide §§ 263 et seq.**

10. **Criminal Law § 1352 (NCI4th) — mitigating circumstances — unanimous finding required — prejudicial error**

The trial court erred in instructing the jury that it must find unanimously the existence of a mitigating circumstance before any juror could consider that circumstance during the capital sentencing proceeding, and there was no merit to the

State's argument that the error was harmless, since substantial evidence was introduced from which a juror reasonably might have found several of the possible mitigating circumstances submitted to exist and to be mitigating.

**Am Jur 2d, Trial §§ 888-894.**

APPEAL of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death, entered by *Allen (J.B., Jr.), J.,* in the Superior Court, ALAMANCE County, on 29 February 1988. Heard in the Supreme Court on 9 April 1991.

*Lacy H. Thornburg, Attorney General, by G. Patrick Murphy, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for the defendant-appellant.*

MITCHELL, Justice.

The defendant was tried on two bills of indictment at the 15 February 1988 Criminal Session of Superior Court, Alamance County, and was convicted of two counts of murder in the first degree. The jury recommended and the trial court entered sentences of death. On appeal, the defendant brings forward numerous assignments of error. We conclude that the defendant's trial and convictions were free from prejudicial error. However, due to the recent decision of the Supreme Court of the United States in the case of *McKoy v. North Carolina,* 494 U.S. 433, 108 L. Ed. 2d 369 (1990), we are forced to hold that errors during the sentencing proceeding in this case require that the sentences of death be vacated and that this case be remanded to the Superior Court for a new capital sentencing proceeding.

The State's evidence at trial tended to show that on 23 June 1987, the defendant was living with Pauline and Hebron Clark Dickens, Jr., his aunt and uncle, in Burlington, North Carolina. During the late afternoon or evening of 23 June, the defendant began to talk "nasty" to Pauline, prompting her to leave the room. She went to her bedroom, where she lay down to take a nap. Sensing the presence of another person in the room, Pauline turned over to discover the defendant standing in the room with his penis erect. She fled from the house, screaming at the defendant and telling him he had to leave.

After the defendant had gone, Pauline called her pastor, Reverend Jean Moore, and asked her to come to the Dickens residence. Pauline called another individual, Rejean Williams, to pick up Reverend Moore and drive her to the Dickens home. In the presence of both Reverend Moore and Williams, Pauline recounted the episode of the defendant's sexual advance earlier that evening. Reverend Moore asked if the defendant had a gun. Pauline went to the defendant's room, retrieved his briefcase and opened it in the presence of Reverend Moore and Williams. The briefcase did not contain the defendant's gun.

Pauline then left for work with Reverend Moore and Williams following her. When Reverend Moore left Pauline at Alamance Memorial to begin her third-shift job, she asked Pauline to telephone her the next morning when she got off work.

After leaving Pauline at the hospital and dropping off Reverend Moore, Williams went to look for the defendant. She located him at approximately midnight. The defendant asked Williams if she had spoken with Pauline, and Williams responded that she had. When the defendant asked if she had believed Pauline, Williams answered that she had not heard both sides. After she made this statement, the defendant said that if he had to go down, Pauline would go down with him.

At some time following his conversation with Williams, the defendant returned to the Dickens residence. He parked his car approximately two blocks away, took his .32 caliber pistol from the glove compartment, and walked to the residence. When the defendant arrived at the residence, no one else was present. He entered the home, hid himself in his cousin's vacant bedroom, and waited. Approximately thirty to forty-five minutes later, Hebron Dickens arrived home from work, came inside and went to bed. The defendant continued to conceal himself.

While still at work, the next morning, Pauline approached Carol Harris, a co-worker and nurse in the adult psychiatry section of the hospital. Pauline told her about the defendant's sexual advance the previous evening. Pauline also told Harris that the defendant had called her aunt and told her that he and Pauline had been sleeping together. Harris stated, "Pauline, you know he didn't call her and say that." Pauline responded, "[O]h, yes he did."

Harris told Pauline not to go home. Pauline replied that she felt she would be safe at home because, although the defendant had a key to the door, there was another lock on the door that the defendant would be unable to unlock. At the end of their conversation, Pauline asked Harris to telephone the police if she did not hear from Pauline by 11:00 a.m.

After Pauline returned home, she began discussing the episode of the defendant's sexual advance with Hebron. In his initial statement to the police, the defendant said that upon hearing this discussion, he walked down the hallway into the living room and shot his aunt and uncle.

Following his initial oral statement, the defendant agreed to review the events again, and to have his statement recorded on audio tape. In his taped statement, the defendant again admitted that he had made a sexual advance towards his aunt, but he also said that the two had been engaging in sexual intercourse for years. He said, however, that as they were engaged in sexual intercourse on 23 June 1987, Pauline suddenly told him to get out. The defendant called Pauline later, and she told him that she was going to reveal their relationship to her pastor and to her husband. Pauline also told the defendant that she had called an aunt in Philadelphia and told her of their relationship. The defendant then called the aunt and learned that Pauline had misrepresented the matter.

The defendant said that he then returned to the house and hid, to insure that Pauline would tell Hebron the truth. Pauline discovered the defendant when she came in to open a window in the bedroom where he was hiding. The defendant said he jumped out from behind the bed, shot his Aunt Pauline and followed her down the hall to the living room. There, the defendant shot his Uncle Hebron who yelled, "No," as he turned toward the defendant.

The defendant left the Dickens residence approximately five minutes after the shootings. Before doing so, he emptied the spent cartridge casings from his pistol, dropping one on the floor. He drove to Hillsborough, where he disposed of the gun. After thinking about the situation, he decided to go to the police station. Before going to the police station, however, the defendant stopped at Kentucky Fried Chicken and had lunch.

Meanwhile, Pauline had called the Alamance County Central Communications 911 emergency number and reported that she had been shot by her nephew. Police and emergency medical personnel were dispatched to the Dickens residence. When the police arrived, the victims were lying side by side on the living room floor. Pauline was still alive, but Hebron exhibited no sign of life. While being transported from the house to the hospital by ambulance, Pauline told Officer Patrick Daly that she had been shot by Amin Ali, who was her nephew. Shortly after arriving at the hospital, Pauline died.

An autopsy report revealed that Pauline had been shot twice. One projectile had hit her central chest area, passed through her heart and lungs and lodged in her back. There was a second wound on the right side of Pauline's body, caused by a bullet which had not damaged any vital organs.

The autopsy performed on Hebron revealed that he had been shot three times. One projectile had struck the center of his chest and passed through his heart and lungs. A second projectile had entered the right side of Hebron's body, passed through his heart and liver, and exited at a point next to the entrance wound made by the projectile which had hit him in the chest. The path and location of the second projectile were consistent with that wound having been inflicted while Hebron was lying on the floor. The third projectile had entered Hebron's left arm and passed through his chest.

The residence was photographed and processed. When Hebron's body was removed, police found a projectile underneath his body immediately below the area where his face and neck had been resting. In addition, the defendant's pistol was recovered from the location where the defendant said he had thrown it away. A ballistics expert testified that both the projectile found under Hebron's body and the one removed from his body had been fired from the defendant's pistol. Further, both projectiles removed from Pauline and the shell casing found on the living room floor had been fired from the defendant's pistol.

The defendant did not offer any evidence at the guilt-innocence determination phase of his trial. The jury found the defendant guilty of first-degree murder based on the theory of premeditation and deliberation as well as the theory of murder committed by lying in wait. A capital sentencing proceeding was then conducted,

STATE v. ALI

[329 N.C. 394 (1991)]

at the end of which the jury recommended a sentence of death for each murder. The trial court entered judgments sentencing the defendant to death.

Additional evidence and other matters relevant to the defendant's specific assignments of error are addressed at other points in this opinion.

[1] In his first assignment of error, the defendant contends that he was denied the right to counsel at a critical stage of his trial when the trial court and his attorneys allowed him to make the decision not to peremptorily challenge a juror his attorneys had wanted to remove. The defendant grounds this claim solely upon a discussion between one of his lawyers and the trial court after both the defendant and the State had finished questioning prospective juror Paul Terrell. From the transcript, it appears that at the conclusion of the questioning of Terrell, an off-the-record bench conference was held. Thereafter, the following exchange took place.

THE COURT: All right. Let the record show that Mr. Terrell is outside of the courtroom. Ms. Jordan, at the bench conference you indicated that you wanted to be heard on the record.

MS. JORDAN: Yes, Your Honor. We would like to have the record reflect that the defendant, Mr. El Amin Ali [sic] wishes to accept this juror in the panel of 12 to hear his case and that this is the desire of the defendant over the — against the recommendations of both his counsel, Dan Monroe and myself.

THE COURT: Now, speaking for the defendant, Ms. Jordan, do you accept juror Paul Terrell to sit on this case?

MS. JORDAN: Speaking for the defendant, we accept him to sit on the case.

THE COURT: All right. Let the record show that both the State and the defendant has [sic] passed and accepted Paul Terrell and he becomes Juror number 4.

Based upon this colloquy, the defendant claims the trial court denied him his right to assistance of counsel by allowing him, rather than his lawyers, to make the final decision regarding whether Terrell would be seated as a juror. We disagree.

STATE v. ALI

[329 N.C. 394 (1991)]

The right to counsel in a serious criminal prosecution is guaranteed by the sixth amendment to the Constitution of the United States. *State v. Hutchins*, 303 N.C. 321, 279 S.E.2d 788 (1981); *State v. Thacker*, 301 N.C. 348, 271 S.E.2d 252 (1980). The attorney-client relationship

> rests on principles of agency, and not guardian and ward. While an attorney has implied authority to make stipulations and decisions in the management or prosecution of an action, such authority is usually limited to matters of procedure, and, in the absence of special authority, ordinarily a stipulation operating as a surrender of a substantial right of the client will not be upheld.

*State v. Barley*, 240 N.C. 253, 255, 81 S.E.2d 772, 773 (1954). The attorney is bound to comply with her client's lawful instructions, "and her actions are restricted to the scope of the authority conferred." *People v. Wilkerson*, 123 Ill. App. 3d 527, 532, 463 N.E.2d 139, 143-44 (1984). "No person can be compelled to take the advice of his attorney." *State v. Franklin*, 714 S.W.2d 252, 261 (Tenn.) (citing *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562 (1975) ), *appeal dismissed*, 479 U.S. 979, 93 L. Ed. 2d 569 (1986).

The American Bar Association Standards for Criminal Justice, although not binding authority, are of interest here and provide that:

> (a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel are:
>
> (i) what plea to enter;
>
> (ii) whether to waive jury trial; and
>
> (iii) whether to testify in his or her own behalf.
>
> (b) The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client.
>
> (c) If a disagreement on significant matters of tactics or strategy arises between the lawyer and the client, the lawyer should make a record of the circumstances, the lawyer's advice

and reasons, and the conclusion reached. The record should be made in a manner which protects the confidentiality of the lawyer-client relationship.

The American Bar Association's Standards for Criminal Justice Standard 4-5.2 (2d ed. 1980). Our Court of Appeals has held that tactical decisions, such as which witnesses to call, "whether and how to conduct cross-examinations, what jurors to accept or strike, and what trial motions to make are ultimately the province of the lawyer. . . ." *State v. Luker*, 65 N.C. App. 644, 649, 310 S.E.2d 63, 66 (1983), *aff'd as to error, rev'd as to harmlessness of error*, 311 N.C. 301, 316 S.E.2d 309 (1984). However, when counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decisions, the client's wishes must control; this rule is in accord with the principal-agent nature of the attorney-client relationship. In such situations, however, defense counsel should make a record of the circumstances, her advice to the defendant, the reasons for the advice, the defendant's decision and the conclusion reached.

In the discussion between the trial court and counsel for the defendant quoted above, Ms. Jordan made just such a record of the disagreement between the defendant and his attorneys. We conclude that her actions were proper, and that the defendant was not denied effective assistance of counsel. *Cf. State v. Davis*, 101 N.C. App. 12, 398 S.E.2d 645 (1990) (It was not prejudicial, if error at all, to allow a criminal defendant to call a witness over the recommendation of his attorney.), *disc. rev. denied*, 328 N.C. 574, 403 S.E.2d 516 (1991). This assignment of error is without merit.

[2] In his next assignment of error, the defendant contends that the trial court's conduct in excusing two prospective jurors violated the sixth amendment to the Constitution of the United States and article I, § 23 of the Constitution of North Carolina. Specifically, the defendant complains of the following:

THE COURT: Approach the bench. (An off-the-record discussion was had at the bench with the Court and a prospective juror present.)

THE COURT: Mr. Balog and Ms. Jordan, he has an excuse not to be excused but to be deferred and I am inclined to defer him to another session. Do you want to be heard?

MR. BALOG: No.

MR. MONROE: No.

THE COURT: Robert Melvin Hicks has good cause to be deferred and without any objection from the State and *without any objection from the counsel for the defendant*, I will defer him to a later session and you tell him what he needs to do.

All right. Do I understand that a Ms. Harris needed to see me?

MS. HARRIS: Yes.

THE COURT: Would you approach the bench? (An off-the-record discussion was had at the bench between the Court and a prospective juror.)

THE COURT: Mr. Balog, Mr. Harviel, Mr. Monroe, Ms. Jordan, this lady here, Ms. Harris is moving to Virginia Friday of this week. I am inclined to go ahead and excuse her. Do you want to be heard Mr. Balog?

MR. BALOG: No, sir.

MR. MONROE: No, sir.

THE COURT: I will excuse you and let the record show that Jean Harris is being excused *without any objections of the State or the defendant.*

(Emphasis added.) The defendant argues that these exchanges at the bench constituted reversible error because they deprived the defendant of his constitutional right to be present at every stage of the proceeding. We disagree.

In *State v. Smith*, 326 N.C. 792, 392 S.E.2d 362 (1990), relying upon cases such as *State v. Blackwelder*, 61 N.C. 38 (1866), this Court held that the trial court's removal of three jurors on the basis of private conversations with each at the bench constituted reversible error under article I, § 23 of the Constitution of North Carolina. In *Smith*, the nature of the conversations could not be determined from the record. Further, the trial court did not attempt to reconstruct the conversations for the record or give reasons for excusing the prospective jurors, other than to announce that they were excused in the trial court's discretion.

In contrast, here, the trial court reconstructed the substance of the bench conferences with the prospective jurors for the record

and, before ruling, gave the defendant an opportunity to be heard. In each instance, the defendant did not make further inquiry as to the verbatim context of the conversation and did not object to the trial court's action, even though specifically given the opportunity to do both. The defendant—while present and represented by counsel—was afforded ample opportunity to have the trial court develop a more extensive record, but elected not to do so. With the defendant present, his counsel consented to these jurors being deferred or excused. This assignment of error is without merit.

[3] By his next assignment of error, the defendant contends that the trial court committed reversible constitutional error during jury selection by preventing the defendant from asking all prospective jurors if they believed that capital punishment was a deterrent to crime. We disagree.

It is well established that both the defendant and the State have the right to question prospective jurors as to their views concerning capital punishment in order to insure a fair and impartial verdict. *State v. Wilson*, 313 N.C. 516, 330 S.E.2d 450 (1985); *State v. Adcock*, 310 N.C. 1, 310 S.E.2d 587 (1983). This right is not unlimited. The trial court is vested with broad discretion to control the extent and manner of such an inquiry, and its decisions will not be disturbed on appeal absent a showing of an abuse of that discretion. *Adcock*, 310 N.C. at 10, 310 S.E.2d at 593.

Generally, whether capital punishment has a deterrent effect is not a proper line of inquiry in a capital case. *State v. Kirkley*, 308 N.C. 196, 302 S.E.2d 144 (1983). Further, this Court has held that "*evidence* concerning the death penalty's deterrent effect is irrelevant to the jury sentencing determination." *Id.* at 215, 302 S.E.2d at 155 (citing *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979) ). This Court later stated that "*Kirkley* stands for the proposition that neither the defendant nor the State can introduce evidence or argue the effect, if any, of the death penalty on the commission of crimes by others." *State v. Zuniga*, 320 N.C. 233, 269, 357 S.E.2d 898, 920, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). Therefore, the trial court did not err in preventing counsel for the defendant from injecting that issue into this capital prosecution. This assignment of error is without merit.

In his next assignment of error, the defendant argues that the hearsay testimony of Reverend Jean Moore and Carol Harris, concerning statements made by Pauline Dickens before her death,

was improperly admitted into evidence under N.C.G.S. § 8C-1, Rule 804(b)(5) (1988). We find no error.

N.C.G.S. § 8C-1, Rule 804, provides in relevant part:

   (b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

      . . . .

   (5) Other Exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

Rule 804(a)(4) defines "unavailability as a witness" to include a situation in which the declarant "[i]s unable to be present or to testify at the hearing because of death . . . ."

In *State v. Triplett*, 316 N.C. 1, 340 S.E.2d 736 (1986), this Court established guidelines for the admission of hearsay testimony under Rule 804(b)(5). First, the trial court must find that the declarant is unavailable before commencing the six-part inquiry prescribed by this Court in *State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985). Where, as here, the declarant is dead, the trial court's determination of unavailability "must be supported by a finding that the declarant is dead, which finding in turn must be supported by evidence of death." *Triplett*, 316 N.C. at 8, 340 S.E.2d at 740.

Once the trial court determines the declarant is unavailable, it must proceed with the six-part inquiry prescribed by *Smith*. Specifically, the trial court must determine

(1) Whether the proponent of the hearsay provided proper notice to the adverse party of his intent to offer it and of its particulars;

(2) That the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4);

(3) That the statement possesses "equivalent circumstantial guarantees of trustworthiness";

(4) That the proffered statement is offered as evidence of a material fact;

(5) Whether the hearsay is "more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable means"; and

(6) Whether "the general purposes of [the] rules [of evidence] and the interests of justice will best be served by admission of the statement into evidence."

*Triplett,* 316 N.C. at 9, 340 S.E.2d at 741 (quoting N.C.G.S. § 8C-1, Rule 804(b)(5) ); *see Smith,* 315 N.C. at 92-96, 337 S.E.2d at 844-46.

[4] The defendant argues that Pauline Dickens' statements to Reverend Moore lacked sufficient guarantees of trustworthiness under part three of the *Triplett* analysis. Specifically, the defendant argues that the trial court erroneously focused on the relationship between Pauline and Reverend Moore, rather than the relationship between Pauline and the defendant. In its order, the trial court found that Pauline and Reverend Moore had known each other through Reverend Moore's church for at least eight months, during which time Pauline's attendance had increased. In addition, the trial court found that when Pauline called Reverend Moore on the evening of 23 June 1987, Pauline was upset, needed to talk, and asked that Reverend Moore come to the Dickens home. The trial court also found that 'a pastor-parishioner relationship had existed between Reverend Moore and Pauline. Based upon its findings, the trial court concluded that Pauline's statements to Reverend Moore possessed sufficient guarantees of trustworthiness.

The pastor-parishioner relationship is recognized as one attended by trust and confidence. There was plenary evidence that Pauline's motivations for speaking with Reverend Moore were concern for her own safety and the need for advice as to how to deal with the defendant. The circumstances and the nature of the information

Pauline related to Reverend Moore caused the trial court to conclude that Pauline's statements possessed sufficient guarantees of trustworthiness. The trial court made no error in its findings and conclusions.

[5] The defendant also argues that Pauline's statements to Carol Harris lacked sufficient guarantees of trustworthiness and that the State failed to provide adequate notice of Harris' hearsay testimony. Again, the defendant specifically argues that the trial court erroneously focused on the relationship between Pauline and Harris, rather than the relationship between Pauline and the defendant. In its order, the trial court found that Harris was a close friend of Pauline, that they talked to each other on numerous occasions regarding many subjects, that they had known each other for nine to ten months, and that they worked in the same department in the hospital and had become good friends. In addition, the trial court found that on the morning of 24 June 1987, Pauline told Harris "I have got to tell you something." Thereafter, they had a private and confidential conversation at the nurses' station. Pauline was scared and nervous and was talking to her good friend in confidence. Pauline told her of an incident that had occurred the night before concerning the defendant, and Pauline was afraid. The trial court also found that Pauline told Harris that if she did not hear from Pauline by 11:00 a.m., she was to contact the police. Further, the trial court found that Pauline did not want Harris to tell anyone else about their conversation. Based upon its findings, the trial court concluded that Pauline's statement to Harris possessed sufficient guarantees of trustworthiness.

We conclude that the evidence before the trial court supported its findings, which in turn supported its conclusion. Ample evidence of the reliability and trustworthiness of Pauline's statements was introduced. Pauline had personal knowledge of the defendant's sexual advance, her motivation was her fear of the defendant, and the statement to Harris was virtually identical to the one she gave to Reverend Moore. Moreover, the statement is further corroborated by the fact that Pauline told Harris that the defendant had called Pauline's aunt and said that he and Pauline had been sleeping together. In the defendant's own statement, he admitted calling the aunt and telling her this story. Pauline could not have known this fact unless she too had spoken with her aunt. The corroboration of this fact by the defendant's own statement, in conjunction with the other factors discussed above, gives Pauline's

statements to Harris the "ring of truth." We agree with the trial court's conclusion that this statement possessed sufficient guarantees of trustworthiness.

With regard to the adequacy of notice provided by the State regarding Harris' testimony, the defendant complains that the purported statements of Pauline provided by the prosecutor did not include the detail developed in Harris' testimony. In *Triplett*, this Court discussed the notice requirement of Rule 804(b)(5). There, we stated that the notice requirement should be construed "somewhat flexibly, in light of the express policy of providing a party with a fair opportunity to meet the proffered evidence." 316 N.C. at 13-14, 340 S.E.2d at 743. The central inquiry is whether the notice gives the opposing party a fair opportunity to meet the evidence.

The defendant does not argue that he was unable to meet the evidence, only that the notice did not include all of Pauline's statements as described by Harris at trial. Specifically, the defendant argues that the notice did not include the following information concerning Pauline's statements to Harris: (1) Pauline said she was lying in bed on her stomach praying for the defendant's "filthy mind"; (2) Pauline said she struck at the defendant and told him that she would kill him; (3) Pauline said that the defendant had called her aunt and had told the aunt that he and Pauline had been sleeping together; (4) Pauline said she thought that the safest place for her would be at work that night; (5) Pauline said that she had called Reverend Moore and that Moore had followed her to work; and (6) Pauline said that the defendant still had a key to her house, but that there was an additional lock on her door which he could not unlock. The trial court ruled that except for testimony concerning the defendant's having been "written up" at work, the notice touched on all of Harris' testimony.

The record shows that the notice was sufficient to inform the defendant of the substance of Pauline's statements and, thereby, to afford the defendant a fair opportunity to meet the State's evidence. The notice was served on 4 February 1988; the trial did not begin until 15 February 1988. In addition, the defendant had a private investigator who interviewed the witness. Under these circumstances, the notice was sufficient. This assignment of error is without merit.

[6] In his next assignment of error, the defendant argues that the trial court committed reversible error when it failed to in-

tervene *ex mero motu* during the prosecutor's closing argument in order to prevent and correct arguments which the defendant claims were speculative and outside the record. Further, the defendant claims prejudicial error resulted when the trial court overruled the defendant's objection to the prosecutor's reference to the defendant as an "animal."

It is well settled that prosecutors are granted wide latitude in the scope of their arguments. *State v. Zuniga,* 320 N.C. 233, 252, 357 S.E.2d 898, 911, *cert. denied,* 484 U.S. 959, 98 L. Ed. 2d 384 (1987); *State v. Monk,* 286 N.C. 509, 212 S.E.2d 125 (1975). So long as the prosecutor's argument is "consistent with the record and does not travel into the fields of conjecture or personal opinion," it is not improper. *Zuniga,* 320 N.C. at 253, 357 S.E.2d at 911; *State v. Craig,* 308 N.C. 446, 302 S.E.2d 740, *cert. denied,* 464 U.S. 908, 78 L. Ed. 2d 247 (1983). The trial court is required to intervene only "where the prosecutor's argument affects the right of the defendant to a fair trial." *Zuniga,* 320 N.C. at 253, 357 S.E.2d at 911; *State v. Harris,* 308 N.C. 159, 301 S.E.2d 91 (1983). Where the defendant fails to object to the prosecutor's argument, "the standard of review is whether such argument was so prejudicial and grossly improper as to require corrective action by the trial judge *ex mero motu.*" *State v. James,* 322 N.C. 320, 324, 367 S.E.2d 669, 672 (1988).

The defendant argues that the following was not supported by the evidence:

> Mr. Dickens is still alive. How do you know that? You see, Mr. Dickens was alive after Mrs. Dickens made the phone call that you heard the tape recording and he managed to turn his head and put his hand towards his wife. How do we know that? *His hand is lying on the telephone when he is found and when Mrs. Dickens is found* after that phone call that you heard the tape recording of, after you heard what Mrs. Dickens said, Mr. Dickens was still alive and husband and wife were nearly face to face and *she watched him die and [the defendant] at some point emptied the shells of his gun as he watched.*

(Emphasis added.) The defendant first argues that assuming a photograph introduced as evidence shows Hebron's body with one hand on the telephone on the floor and would support an inference of conscious movement after Pauline had called the police, there

is no testimony or other evidence that his hand was on the telephone at the time of the initial entry of the officers. "Where the record is silent on a particular point, the action of the trial court will be presumed correct." *State v. James*, 321 N.C. 676, 686, 365 S.E.2d 579, 585 (1988). Here, the photograph relied upon by the prosecutor during his argument and referred to on appeal by the defendant was not brought forward with the record on appeal. Therefore, we are unable to review this exhibit in order to determine if it supported the inference raised in the prosecutor's argument. The defendant has failed to bring forward a record sufficient to allow proper review of this issue and has failed to overcome the presumption of correctness at trial.

In addition, the defendant argues that the prosecutor's arguments that Pauline watched Hebron die and that the defendant watched both victims as he emptied his gun were completely speculative. The defendant argues that there is no indication in the evidence of when Hebron actually died, except the medical examiner's testimony that the three wound tracks through the heart and lungs, each independently capable of causing death, "would cause rapid, immediate bleeding into the space around the heart and into the cavity the lungs lie in and rapidly cause failure of the heart and death." Further, the defendant contends that there was no evidence concerning the victims' consciousness or level of awareness after the shootings, except for Pauline's telephone call to the authorities, her moaning and raising up without actually speaking upon the initial entry of the officers into the Dickens home, and her utterances to an officer immediately after having been placed in the ambulance. The defendant argues that from such evidence, any argument that Pauline was conscious at the time of her husband's death or that Hebron was aware that the defendant was emptying his gun was completely speculative. We disagree.

The prosecutor's argument that Hebron lived for some period of time is supported by the evidence. A significant amount of blood was found beneath Hebron's body, permitting an inference that his heart continued to pump blood after the shooting and that he survived for some period of time following infliction of the gunshot wounds. In addition, the fact that Pauline had the presence of mind to reach the telephone, dial the correct number, give her name, name her nephew as her assailant, and give her correct address and location to the authorities would support a reasonable

inference that she was aware of what was going on around her as she and her husband lay dying on the floor. Finally, in his own statement, the defendant said he stayed in the house for approximately five minutes during which time he unloaded the empty casings from his weapon. Therefore, it would be reasonable to infer that at some point before he left the house, the defendant looked over at the victims as they lay shot and dying on the floor.

The prosecutor's argument contained logical inferences drawn from the evidence. Clearly, the argument was not so prejudicial and grossly improper as to require the trial court to intervene *ex mero motu*, and the trial court did not err by failing to do so.

[7] The defendant also argues that the trial court erred in overruling his objection to the following portion of the prosecutor's closing argument:

> So, she goes in the house. She thinks she has reached a safe haven. I am in the sanctity of my home. I have thrown him out. He will honor that. I told him to leave. He left. He knows I mean business. I am safe.
>
> Can you imagine the horror, ladies and gentlemen, when she goes home, she locks that door, she thinks she has locked the *animal* out.
>
> MR. MONROE: Object, Your Honor.
>
> THE COURT: Overruled.

(Emphasis added.) This Court has indicated that it "does not condone comparisons of criminal defendants to members of the animal kingdom." *State v. Hamlet*, 312 N.C. 162, 173, 321 S.E.2d 837, 845 (1984); *see State v. Smith*, 279 N.C. 163, 181 S.E.2d 458 (1971). However, assuming *arguendo* that the "animal" comparison was error, the defendant nevertheless must show that such error was prejudicial. N.C.G.S. § 15A-1443(a) (1988). To do so, the defendant must show that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached. . . ." *State v. Gardner*, 316 N.C. 605, 613, 342 S.E.2d 872, 878 (1986). Given the isolated nature of this remark in the present case, we conclude that its effect could only have been *de minimus*. The defendant has failed to make the required showing of prejudice, and this assignment of error is without merit.

[8]  In his next assignment of error, the defendant contends that
the trial court erred by allowing the prosecutor to elicit from the
medical examiner his opinion that one of the shots fired into Hebron's
body had been inflicted after Hebron had fallen. Specifically, the
defendant assigns as error the following colloquy:

Q Doctor Butts, assuming that the jury should find that Mr.
Hebron Dickens was found—body was found generally face
down, also assuming that a bullet was found under his body,
do you have an opinion as to the position of Mr. Dickens when
he was shot?

MS. JORDAN: Objection

MR. MONROE: Objection.

THE COURT: Do you have an opinion, Doctor?

A I can't answer the question phrased that way. I would not
have an opinion.

Q (By Mr. Harviel) Doctor Butts, do you have an opinion satisfac-
tory to yourself, if assuming that the jury should find that
Mr. Dickens was found face down and that a bullet was
discovered under his body in the general position of his neck
or upper chest, do you have an opinion satisfactory to yourself
within a reasonable degree of medical certainty as to the posi-
tion of Mr. Dickens' body when he was shot and the relation-
ship to the gun that shot the bullet?

MR. MONROE: Objection.

MS. JORDAN: Objection.

THE COURT: Do you have an opinion?

A Yes, sir.

Q (By Mr. Harviel) And what is that opinion?

MR. MONROE: Objection.

MS. JORDAN: Objection.

TRIAL COURT: Overruled. You may give your opinion.

A In relation to the wound I have labeled number two, the
bullet that caused that wound would have exited from the
front part of his body. If that—if a bullet was found in that

location on the floor, that would be consistent with him being lying down at the time that particular wound was inflicted, if, in fact, that bullet was the bullet that entered in the right side.

MR. MONROE: Move to strike.

THE COURT: Motion denied.

The defendant argues that the medical examiner's testimony was based on a fact not in evidence — the location of the victim's body when the victim was found. Specifically, the defendant argues that since medical personnel may have moved Hebron's body and altered the original location of the projectile found under it, no reasonable opinion could have been drawn from the body location as depicted in the crime scene photographs. We disagree.

N.C.G.S. § 8C-1, Rule 703 provides that:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Under N.C.G.S. § 8C-1, Rule 705, the defendant may require the expert to disclose the particular facts or data underlying his opinion. Here, the pathologist did not give a conclusive opinion that Hebron was lying on the floor when "gunshot wound number two" was inflicted. He only stated that if the projectile found under Hebron's body had caused "gunshot wound number two" and exited the front of the body, "that would be consistent with him being lying down at the time that particular wound was inflicted." This testimony is supported by the evidence. Police personnel found a projectile underneath Hebron's body in the neck or facial area. All the other projectiles were found in the victims' bodies.

The projectile which caused the wound described as "gunshot wound number two" had exited the front of the body right beside the entrance wound to the chest labeled "gunshot wound number one." The pathologist concluded that the projectile "traveled forwards, upwards, and from the right side to the left side. . . ." The opinion given by the pathologist was properly admitted in light of the evidence introduced at trial. Further, any question as to movement of the body or failure to preserve the integrity

of the crime scene goes to the weight to be given the pathologist's opinion, not its admissibility. This assignment of error is without merit.

**[9]** In his next assignment of error, the defendant contends that the trial court erred by admitting, over the defendant's objections, expert and lay testimony concerning the pain experienced by Pauline Dickens during her last moments of life. Specifically, the defendant argues that testimony of the officer who rode to the hospital in the ambulance with Pauline was improper. That testimony was as follows:

Q All right, now, while you were with Mrs. Dickens in the ambulance on the way to the hospital, state whether or not she appeared to be in pain?

MR. MONROE: We object to that.

THE COURT: Overruled.

A Yes, sir. She seemed to be in a great deal of pain.

MR. MONROE: Move to strike that answer.

THE COURT: Motion denied.

Q . . . What do you base that opinion on?

MR. MONROE: Objection.

THE COURT: Overruled.

A Basically, by the tone of her voice, the actions she was making in the ambulance.

MR. MONROE: Move to strike.

THE COURT: Motion denied.

Q . . . What was she doing in the ambulance?

A She was calling out for the rescue people to help her on several occasions. She was yelling, moaning, if you will.

MR. MONROE: Move to strike.

THE COURT: Motion denied.

MR. BALOG: Nothing further.

STATE v. ALI

[329 N.C. 394 (1991)]

In addition, the defendant objects to the fact that the State elicited testimony over the defendant's objection from the medical examiner that Pauline's wounds would have been painful. The defendant argues that all evidence concerning pain experienced by the victims was irrelevant to any issue of fact in either phase of his trial and, thus, inadmissible. We disagree.

This Court has identified several factors which are relevant in determining whether a killing was done with premeditation and deliberation. *State v. Vause*, 328 N.C. 231, 400 S.E.2d 57 (1991). Included among these factors is the conduct of the defendant before and after the killing. *Id.* at 238, 400 S.E.2d at 62. The defendant stated that he stayed in the house for more than five minutes after the shootings. The evidence tended to show that Pauline was alive during that time and that she was able to telephone for help later. In addition, on the way to the hospital, she was moaning and calling out for help. A reasonable inference may be drawn from this evidence that the defendant watched Pauline suffer in pain as she lay on the floor, yet he did nothing to help her. Such an inference would tend to establish that the defendant acted with malice, premeditation and deliberation. *See State v. Drayton*, 323 N.C. 585, 374 S.E.2d 262 (1988); *State v. Prevette*, 317 N.C. 148, 345 S.E.2d 159 (1986).

In addition, N.C.G.S. § 8C-1, Rule 803(2) — the excited utterance exception to the rule against hearsay — allows the admission of out-of-court statements relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition. Pauline's statement to the officer wherein she named the defendant as her assailant was admitted pursuant to Rule 803(2). Evidence that Pauline suffered great pain at the time the statement was made was clearly relevant to the trustworthiness of the statement. Since the defendant objected to the introduction of Pauline's statement, made shortly before she died, that the defendant had shot her, the State was entitled to introduce evidence of the conditions under which the statement was made to establish its trustworthiness. This assignment of error is without merit.

[10] In his next assignment of error, the defendant argues that the trial court committed reversible constitutional error in violation of *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), by instructing the jury that it must find unanimously the existence

of a mitigating circumstance before any juror could consider that circumstance during the capital sentencing proceeding. The State concedes that the unanimity instruction concerning mitigating circumstances was constitutionally defective under *McKoy*, but argues that the error was harmless.

The State having conceded that a *McKoy* unanimity error occurred in this case, the sole issue is whether that error may be deemed harmless. *See State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426 (1990). Because the *McKoy* error in the jury instructions was of constitutional magnitude, " '[t]he burden is on the State to demonstrate, beyond a reasonable doubt, that the error was harmless.' " *State v. McNeil*, 327 N.C. 388, 394, 395 S.E.2d 106, 111 (quoting N.C.G.S. § 15A-1443(b) (1988) ), *cert. denied*, --- U.S. ---, 113 L. Ed. 2d 459 (1991). On the record before us, we are forced to conclude that the State has not carried this burden.

The trial court submitted nine possible mitigating circumstances for the jury's consideration:

(1) This murder was committed while the defendant was under the influence of mental or emotional disturbance.

. . . .

(2) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

. . . .

(3) Prior to arrest or to [sic] an early stage of the criminal process, the Defendant voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer.

. . . .

(4) The Defendant has been a person of good character or has had a good reputation.

. . . .

(5) The violent nature of the crime for which the Defendant has been convicted is out of character and inconsistent with prior conduct of the Defendant.

. . . .

(6) The Defendant has shown a willingness to assume responsibility for his conduct and has shown remorse over the death of the victim.

. . . .

(7) The Defendant has engaged in work which provides direct assistance to people.

. . . .

(8) The Defendant, since his incarceration, has shown himself to be a person who could adjust well to prison life and be of service to other prisoners.

. . . .

(9) Any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value.

Of these nine possible mitigating circumstances, the jury found only one as to each murder—that prior to arrest or at an early stage in the criminal process, the defendant voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer.

Our review of the record reveals that substantial evidence was introduced from which a juror reasonably might have found several of the possible mitigating circumstances submitted to exist and to be mitigating. Therefore, we may not hold that the trial court's error was harmless.

The fourth possible mitigating circumstance submitted was that the defendant "has been a person of good character or has had a good reputation." The testimony of eleven witnesses supported its submission. Linda Lynch, a radiology technologist, testified to the defendant's polite and calm demeanor as an orderly in her department at Alamance Memorial Hospital. Another radiology department employee, Masoud Ghiassi, also testified to the defendant's polite and gentle manner. Lynette Corbin, another radiology department employee testified that patients commented on the defendant's demeanor, and that the defendant's reputation in the hospital was one of kindness. Judy Rivenbark, assistant chief technologist in the radiology department testified that the defendant was always very cooperative, pleasant and mannerly, and that the defendant was well thought of by other employees. Stella Cheek,

a supervisor in the psychiatric unit at the hospital, the department to which the defendant transferred from radiology, testified that the defendant always seemed to be "reaching for higher." In addition, Carol Wilson, the radiology department administrator, testified to the caring the defendant showed in working with patients, as well as to the polite and courteous manner the defendant demonstrated in working with staff members.

Dr. Mohammed Bhatti testified to the defendant's respectful manner with patients and to the defendant's high reputation within the local Muslim community. Similarly, Nazeale Abdul-Hakeen testified that the defendant had been welcome in Hakeen's mosque because of his pleasant, gentle demeanor and his kindness. Christopher Watkins, a Burlington attorney who represented the defendant in a divorce action, testified that even in circumstances which would anger or upset the usual client, the defendant remained courteous, kind and understanding. Patsy Bird, operator of a group home in which the defendant had been employed part time, testified that the defendant was a polite, cooperative, and caring person who seemed to be trying to get ahead by taking on part-time employment in addition to his regular work. Even in jail, according to Deputy William Folks, the defendant never raised his voice or said anything out of place. Based upon this evidence, we are unable to say beyond a reasonable doubt that no juror reasonably could have found that the defendant was a person of good character or that the defendant had had a good reputation.

The fifth possible mitigating circumstance was that the defendant's character and prior conduct were inconsistent with the violent crime for which the defendant had been convicted. Ten witnesses testified that the crimes were a radical departure from the defendant's usual behavior and character. Given such evidence, we are unable to say beyond a reasonable doubt that no juror reasonably could have found this circumstance to exist and to be mitigating.

The sixth possible mitigating circumstance was that "[t]he Defendant has shown a willingness to assume responsibility for his conduct and has shown remorse over the death of the victim." During his interrogation by the police after surrendering himself on the day of the shooting, the defendant expressed regret and sorrow for what he had done. Hakeen, who visited the defendant in jail, testified that it was obvious that the defendant was sorry

for what he had done and that he accepted responsibility for his actions. In addition, Masoud Ghiassi visited the defendant in jail and also testified to his remorse. Masoud's wife, Shaheen Ghiassi, testified that in letters the defendant had written to the Ghiassis after his incarceration, he had expressed hope that God would forgive him for his actions. Given such evidence, we are unable to say that no juror reasonably could have found this circumstance to exist and to be mitigating.

The seventh possible mitigating circumstance was that "[t]he Defendant has engaged in work which provides direct assistance to people." That the defendant had done work which provided direct assistance to people obviously was supported by the evidence of his employment in two departments of the hospital and in the group home. A rational juror could have found mitigating value in the defendant's choice of employment in jobs which provided direct assistance to others. *Cf. McNeil*, 327 N.C. at 395, 395 S.E.2d at 111 (juror reasonably might have deemed evidence that defendant "had been a good and useful employee" for construction company mitigating). We are unable to say beyond a reasonable doubt that no juror reasonably could have found this circumstance to exist and to be mitigating.

The eighth possible mitigating circumstance was that "[t]he Defendant, since his incarceration, has shown himself to be a person who could adjust well to prison life and be of service to other prisoners." Deputy Folks testified that the defendant had adjusted to incarceration in the local jail and had been a model prisoner. In addition, Hakeen, who did volunteer work with the Department of Correction and had worked for a number of years in its facilities, testified that in his opinion the defendant would be a positive influence on other inmates. Further, Masoud Ghiassi testified that the defendant had expressed a desire to be of service to the prison community. Given such evidence, we are unable to say beyond a reasonable doubt that no juror reasonably could have found this circumstance to exist and to be mitigating.

The remaining possible mitigating circumstances not found were statutory mitigating circumstances. The first of these, that the "murder was committed while the defendant was under the influence of mental or emotional disturbance," was submitted pursuant to N.C.G.S. § 15A-2000(f)(2). The whole of the evidence indicated that the defendant was not a person given to emotional displays.

STATE v. ALI

[329 N.C. 394 (1991)]

However, the State's evidence tended to show that when Pauline ordered the defendant away from her house, he was crying and saying he had no place to go. Later the same evening, according to the testimony of the State's witness Rejean Williams, the defendant was not his usual calm self; he spoke nervously. Nor was he neat as he usually was; instead, his clothes were disheveled. A rational juror could have determined that such testimony, along with evidence of the defendant's inability to express to the interrogating officers why he had shot the victims, and his anger at the time of the shooting indicated the influence of a mental or emotional disturbance upon his actions.

The final possible mitigating circumstance submitted to the jury was whether there was "[a]ny circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value." N.C.G.S. § 15A-2000(f)(9) (1988). The defendant argues that, among other circumstances in mitigation, one or more jurors could have found that the defendant's decision not to reload the gun and continue shooting his aunt and uncle, his continued adherence to his religious faith following his arrest and incarceration, his honesty in his dealings with attorney Christopher Watkins, his having attained a G.E.D. and some additional training at a technical college, and his cooperation with investigating officers all had mitigating value. Given the evidence adduced at trial at the sentencing proceeding, we cannot say beyond a reasonable doubt that no juror reasonably could have found this circumstance to exist.

For the foregoing reasons, we are unable to say that the *McKoy* error in the instructions in the present case was harmless beyond a reasonable doubt. Accordingly, the defendant's sentences of death must be vacated, and the defendant must receive a new sentencing proceeding.

In conclusion, we hold that the guilt-innocence determination phase of the defendant's trial was free from prejudicial error. However, the sentences of death are vacated and this case is remanded to the Superior Court, Alamance County, for a new capital sentencing proceeding as to both convictions for first-degree murder. *See McNeil*, 327 N.C. 388, 395 S.E.2d 106.

Guilt phase: No error. Death sentence vacated and case remanded for new capital sentencing proceeding.