IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-280

Filed 5 March 2024

Wake County, No. 20 CRS 206791

STATE OF NORTH CAROLINA

v.

CURTIS LEVON JACKSON, Defendant.

Appeal by Defendant from judgment entered 12 August 2021 by Judge Keith O. Gregory in Wake County Superior Court. Heard in the Court of Appeals 11 January 2023.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General M. Denise Stanford, for the State.*

*Joseph P. Lattimore for Defendant.*

GRIFFIN, Judge.

Defendant Curtis Levon Jackson appeals from judgment entered upon a jury verdict finding him guilty of second-degree forcible sex offense; second-degree forcible rape; first-degree kidnapping; assault on a female; interfering with emergency communication; assault with a deadly weapon; and assault inflicting serious injury. Defendant contends he was denied protections guaranteed by the Sixth Amendment when he was deprived of both the right to autonomy in the presentation of his defense and the right to effective assistance of counsel. Defendant further contends the trial court lacked jurisdiction to sentence him for habitual misdemeanor assault where the

indictment was facially invalid. We hold Defendant was not denied any right guaranteed by the Sixth Amendment. Additionally, we hold the trial court maintained jurisdiction to sentence Defendant for habitual misdemeanor assault as the indictment was not facially invalid.

## I.    Factual and Procedural Background

This case arises from incidents which occurred 26 April 2020. Evidence at trial tended to show the following:

In March 2020, Defendant met the victim at a grocery store. The two began dating and maintained a tumultuous relationship. On the evening of 25 April 2020, victim attended a party. Defendant became agitated and repeatedly called victim. When victim finally answered, Defendant told her to bring him food. Defendant threatened to drive to victim's home, where she resided with her children, if she refused. In an effort to keep Defendant away from her children, victim reluctantly agreed to take food to Defendant at his home.

Upon victim's arrival with the food, Defendant turned off victim's phone and took her keys. Throughout the night and into the next morning, 26 April 2020, Defendant continually raped and assaulted victim. Defendant told victim, on the morning of 26 April 2020, she was going to drive him to an appointment. Defendant threatened to tie victim up in his room if she refused.

Victim drove Defendant to the appointment but remained in the car. Throughout Defendant's appointment, victim made several attempts to get help.

Eventually, she was able to alert a store clerk nearby to call the police. Defendant was arrested shortly thereafter, and victim was transported to a nearby hospital for treatment of her injuries.

On 4 May 2020, Defendant was indicted on charges of second-degree forcible sex offense, second-degree forcible rape, first-degree kidnapping, assault on a female, habitual misdemeanor assault, interfering with emergency communication, assault with a deadly weapon, and assault inflicting serious injury.

The matter came on for jury trial on 9 August 2021 in Wake County Superior Court. On 12 August 2021, the jury returned a verdict, finding Defendant guilty on all charges. The trial court arrested judgment on the assault inflicting serious injury conviction—the predicate offense for the habitual misdemeanor assault conviction. The court then pronounced judgment and sentenced Defendant on the remaining convictions.

Defendant gave notice of appeal in open court.

## II.    Analysis

Defendant argues (A) he was denied protections guaranteed by the Sixth Amendment when he was deprived of both the right to autonomy in the presentation of his defense and the right to effective assistance of counsel. Defendant further argues (B) the trial court lacked jurisdiction to sentence him for habitual misdemeanor assault as the indictment was facially invalid. We disagree.

**A. The Sixth Amendment**

Defendant contends he was denied protections guaranteed by the Sixth Amendment when he was deprived of both the right to autonomy in the presentation of his defense and the right to effective assistance of counsel.

We review alleged violations of a defendant's constitutional rights de novo. *See State v. Crump*, 273 N.C. App. 336, 342, 848 S.E.2d 501, 505 (2020); *see also State v. Williams*, 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008) ("Under a de novo review, the [C]ourt considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." (internal marks, emphasis, and citation omitted)).

### 1. *Defendant's right to autonomy in the presentation of his defense*

Defendant contends he was denied his Sixth Amendment right to autonomy in the presentation of his defense as the trial court committed a structural error in failing to instruct Defendant's counsel to conform to Defendant's desire to introduce documentary evidence when the two reached an absolute impasse.

The Sixth Amendment guarantees the accused, in all criminal prosecutions, not only the right to have the assistance of counsel in making his defense, but also the right to make his own defense. *See* U.S. Const. amend. VI; N.C. Const. Art. I, § 23 ("In all criminal prosecutions, every person charged with crime has the right to . . . have counsel for defense[.]"); *see also State v. Payne*, 256 N.C. App. 572, 581, 808 S.E.2d 476, 483 (2017) ("Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is [ ] necessarily implied by the structure of the Amendment." (quoting *Faretta v.*

*California*, 422 U.S. 806, 819–20 (1975))). Even where a defendant elects to exercise his right to have the assistance of counsel, he is still entitled to some autonomy over his defense. *See Faretta*, 422 U.S. at 819–20; *see also State v. Ali*, 329 N.C. 394, 403, 407 S.E.2d 183, 189 (1991) ("No person can be compelled to take the advice of his attorney." (internal marks and citations omitted)). This is because the attorney-client relationship is one based in the "principles of agency, [ ] not guardian and ward." *Ali*, 329 N.C. at 403, 407 S.E.2d at 189 (internal marks and citation omitted). Thus, an attorney "is bound to comply with her client's lawful instructions" and may only act within the scope of the authority conferred upon her by the defendant. *Id.* (citation omitted).

Our Courts have previously recognized certain decisions, relating to the conduct of a case, are to be made by the accused, while other strategic and tactical decisions, such as what and how evidence should be introduced, are to be made by defense counsel after consultation with the defendant. *Id.*; *see also* The American Bar Association Criminal Justice Standards for the Defense Function Standard 4-5.2 (4th ed. 2017). However, where the defendant and his defense counsel reach an absolute impasse and are unable come to an agreement on such tactical decisions, the defendant's wishes must control. *State v. Ward*, 281 N.C. App. 484, 487, 868 S.E.2d 169, 173 (2022) (internal marks and citation omitted). Notably, upon reaching an absolute impasse, "defense counsel should make a record of the circumstances, her advice to the defendant, the reasons for the advice, the defendant's decision and the

conclusion reached." *Ali*, 329 N.C. at 404, 407 S.E.2d at 189; *see also State v. Floyd*, 369 N.C. 329, 340, 794 S.E.2d 460, 467 (2016).

In *State v. Floyd*, the defendant argued, on appeal, the trial court failed to adequately address an impasse between the defendant and his counsel regarding certain unidentified questions the defendant wanted to be asked of a witness. *Id.* Further, the defendant argued the trial court's failure to instruct his counsel to comply with his wishes amounted to a denial of his constitutional right to control his defense and confront a witness. *Id.* Our Supreme Court stated, while the defendant did tell the court his attorney was not asking the questions the defendant told him to ask, the record did "not shed any light on the nature or the substance" of those questions. *Id.* at 341, 794 S.E.2d at 468. Further, the Court also recognized the defendant was generally disruptive throughout trial and was forced to leave the courtroom, which led him to have a consultation with his attorney, while the witness, to whom he wished to ask the desired questions, was on the witness stand. *Id.* Accordingly, our Supreme Court held it was unable, without engaging in conjecture, to determine whether the defendant had a serious disagreement with his attorney regarding trial strategy and therefore could not determine, from the cold record, whether an absolute impasse existed. *Id.*

Here, defense counsel stated Defendant would not introduce evidence or testify on his own behalf. The trial court then conducted a colloquy to ensure Defendant understood it was his right to testify and was waiving the right upon his own volition:

TRIAL COURT: All right. Now, you mentioned—I mentioned evidence. You have a right to present evidence through other witnesses and so forth. Do you understand that?

DEFENDANT: Yes, sir.

TRIAL COURT: All right. My understanding is you have no intentions of putting on any evidence; is that correct?

DEFENDANT: I have no intention of testifying.

TRIAL COURT: Okay. Are you going to present any evidence?

DEFENDANT: I wanted my attorney to present some evidence.

. . .

TRIAL COURT: All right. Now, are you—in reference to evidence, is it some type of documentation or some type of physical or tangible object that you wanted to present as evidence?

DEFENDANT: Yeah, documentation.

Defendant contends, during this colloquy, the trial court was presented with an absolute impasse, which occurred between Defendant and defense counsel, concerning Defendant's desire to introduce certain documentary evidence. However, while Defendant did announce to the court he wanted his attorney to "present some evidence," the record fails to indicate the substance of such questions. Therefore, just as our Supreme Court held in *Floyd*, we hold we are unable to determine from the

cold record whether there was a true disagreement, which would amount to an absolute impasse, between Defendant and defense counsel.

Defendant further contends, upon being presented with what he argued was an absolute impasse, the trial court committed a structural error.

A structural error is a rare constitutional error "resulting from structural defects in the constitution of the trial mechanism[.]" *State v. Garcia*, 358 N.C. 382, 409, 597 S.E.2d 724, 744 (2004) (internal marks and citation omitted). These errors "prevent a criminal trial from reliably serving its function as a vehicle for determination of guilt or innocence." *State v. Veney*, 259 N.C. App. 915, 919, 817 S.E.2d 114, 117 (2018) (internal marks and citation omitted); *see also Garcia*, 358 N.C. at 409, 597 S.E.2d at 744 ("Such errors infect the entire trial process and necessarily render a trial fundamentally unfair[.]" (internal marks and citations omitted)). Our Supreme Court has identified six instances of structural error, which include:

> (1) complete deprivation of right to counsel; (2) a biased trial judge; (3) the unlawful exclusion of grand jurors of the defendant's race; (4) denial of the right to self-representation at trial; (5) denial of the right to a public trial; and (6) constitutionally deficient jury instructions on reasonable doubt.

*State v. Minyard*, 289 N.C. App. 436, 448–49, 890 S.E.2d 182, 191 (2023) (internal marks and citations omitted). These structural errors are reversible per se. *See State v. Campbell*, 280 N.C. App. 83, 87–88, 866 S.E.2d 325, 328 (2021) (quoting *Garcia*,

358 N.C. at 409, 597 S.E.2d at 744 ("[A] defendant's remedy for structural error is not [dependent] upon harmless error analysis[.]")).

After Defendant stated there was documentary evidence he wanted defense counsel to introduce, the trial court conducted the following colloquy:

> TRIAL COURT: All right. Now, you've talked about this with your attorney, correct?
>
> DEFENDANT: Yes, sir.
>
> TRIAL COURT: All right. Your attorney has addressed with you the legal issues as far as any documentation is concerned?
>
> DEFENDANT: Legal issues as?
>
> TRIAL COURT: About how it could be—if it can be admitted into evidence.
>
> . . .
>
> [discussion of potential foundational issues concerning the introduction of evidence]
>
> . . .
>
> TRIAL COURT: You may not agree with it, but do you understand it?
>
> DEFENDANT: Yeah. Like—like if I wanted to enter some type of evidence, it would totally be up to my attorney? Evidence away from me testifying?
>
> TRIAL COURT: Well, if your attorney has determined that that evidence may not be legally admissible, relevant, pertinent, and a slew of other things, he can make that determination. But I will say this also,

> even if you thought, respectfully, if you were representing yourself and you attempted to put that object in, I cannot guarantee it's going to come into evidence if it's not coming in properly under the evidentiary rules. Because there are rules that would involve whether or not it's admissible or not.

Defendant argues the trial court committed structural error as it failed to properly address the alleged absolute impasse when it did not require defense counsel to comply with Defendant's desire to present evidence.

As stated above, we are unable to determine from the cold record whether there existed an absolute impasse between Defendant and defense counsel. Nonetheless, the error here, which Defendant contends amounted to a structural error, is not one our Supreme Court has previously identified as a structural error. *See Minyard*, 289 N.C. App. at 448–49, 890 S.E.2d at 191. Therefore, Defendant's argument fails.

### 2. *Defendant's right to effective assistance of counsel*

Defendant contends he was denied his Sixth Amendment right to effective assistance of counsel as defense counsel committed a *Harbison* error during closing arguments by impliedly conceding Defendant's guilt. Further, Defendant argues the trial court erred as it failed to conduct an inquiry with Defendant to ensure he knowingly consented to defense counsel's concession of guilt.

Again, we note the Sixth Amendment guarantees the accused, in all criminal prosecutions, the right to have the assistance of counsel in making his defense. *See*

U.S. Const. amend. VI; N.C. Const. Art. I, § 23. Inherent in the right to the assistance of counsel is the right to have effective assistance of counsel. *See State v. McNeill*, 371 N.C. 198, 217, 813 S.E.2d 797, 812 (2018) (citation omitted). Generally, where a defendant makes an ineffective assistance of counsel claim, arguing he was denied effective assistance of counsel, he must satisfy a two-part test established by the United States Supreme Court in *Strickland v. Washington*. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *see also State v. Braswell*, 312 N.C. 553, 562–63, 324 S.E.2d 241, 248 (1985) ("[W]e expressly adopt the test set out in *Strickland v. Washington* as a uniform standard to be applied to measure ineffective assistance of counsel under the North Carolina Constitution."). To meet his burden under *Strickland*, a defendant must show (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *See Strickland,* 466 U.S. at 687–88; *see also McNeill*, 371 N.C. at 218, 813 S.E.2d at 812.

While acknowledging the *Strickland* test for claims of ineffective assistance of counsel, our Supreme Court in *State v. Harbison* held ineffective assistance of counsel, per se in violation of the Sixth Amendment, occurs where defense counsel admits a defendant's guilt to the jury without consent. *State v. Harbison*, 315 N.C. 175, 180, 337 S.E.2d 504, 507–08 (1985). This violation, known as a *Harbison* error, exists where, in viewing the defense counsel's statements in context, the statements "'cannot logically be interpreted as anything other than an implied concession of guilt to a charged offense[.]'" *State v. Moore*, 286 N.C. App. 341, 345, 880 S.E.2d 710, 714

(2022) (quoting *State v. McAllister*, 375 N.C. 455, 475, 847 S.E.2d 711, 723 (2020));

*see also State v. Mills*, 205 N.C. App. 577, 587, 696 S.E.2d 742, 748–49 (2010)

(explaining defense counsel's statements "must be viewed in context to determine

whether the statement was, in fact, a concession of [the] defendant's guilt of a

crime[.]" (citation omitted)); *McAllister*, 375 N.C. at 473, 847 S.E.2d at 722 (holding

*Harbison* errors extended not only to the defense counsel's express admissions of guilt

but also to implied admissions of guilt).

A *Harbison* error does not exist where the defendant has consented to his

counsel's statement as a trial strategy. *McAllister*, 375 N.C. at 475, 847 S.E.2d at

723. However, even under these circumstances, "the trial court must be satisfied

that, prior to any admissions of guilt . . . , the defendant [gave] knowing and informed

consent, and the defendant [was] aware of the potential consequences of his decision."

*State v. Foreman*, 270 N.C. App. 784, 790, 842 S.E.2d 184, 189 (2020) (internal marks

and citation omitted).

In *State v. McAllister*, the defendant was indicted on charges of: habitual

misdemeanor assault based on assault on a female, assault by strangulation, second-

degree sexual offense, and second-degree rape. 375 N.C. at 458–59, 847 S.E.2d at

714. During the State's case in chief, a law enforcement interview with the defendant

was entered into evidence and played for the jury. *Id.* at 459, 847 S.E.2d at 714.

Then, during closing arguments, the defense counsel referred to the interview stating:

> You heard him admit that things got physical. You heard

him admit that he did wrong, God knows he did. They got in some sort of scuffle or a tussle or whatever they want to call it, she got hurt, he felt bad, and he expressed that to detectives. . . .

. . .

[Y]ou may dislike [the defendant] for injuring [the victim], that may bother you to your core but he, without a lawyer and in front of two detectives, admitted what he did and only what he did. He didn't rape this girl. . . .

. . .

Can you convict this man of rape and sexual offense, assault by strangulation based on what they showed you? You can't. Please find him not guilty.

*Id.* at 460–61, 847 S.E.2d at 715. After deliberation, the jury returned a verdict finding the defendant not guilty on all charges except the charge of assault on a female. *Id.* at 461, 847 S.E.2d at 715.

On appeal, our Supreme Court noted the defense counsel's statements were problematic as he: attested to the accuracy of the admissions made by the defendant in his interview; reminded the jury the defendant did wrong and implied there was no justification for the defendant's use of force against the victim; and asked the jury to find the defendant not guilty of all charges while omitting mention of the charge of assault on a female. *Id.* at 474, 847 S.E.2d at 722–23. Thus, our Supreme Court held the defense counsel's statements amounted to an implied admission of guilt and remanded the case to the Superior Court for an evidentiary hearing to determine whether the defendant knowingly consented in advance to the defense counsel's

admission of guilt to the assault on a female charge. *Id.* at 477–78, 847 S.E.2d at 725.

Here, in his closing argument, defense counsel stated, in relevant part:

> [Defendant] is charged with some very serious crimes. I mean, kidnapping, forcible rape. Years and years and years in prison.
>
>  . . .
>
> When you look at evidence in this case, the credible evidence, . . . not evidence that just comes out of her mouth. She says it, that doesn't make it true. You are the sole judges of credibility in this case. You have to use your common sense. You have to evaluate the witness. And that's your job.
>
>  . . .
>
> I mean, ladies and gentlemen, when a witness gets up here and makes—spits out rhetoric that doesn't make any sense at all, you can't just accept it as true.
>
>  . . .
>
> So, when you think about the other witnesses, the nurse . . . that form that was filled out that I believe has been submitted to evidence, you all got to look at it, the checklist, it said no injuries. I mean, we're talking about the neck and we're talking about strangulation, but there's no marks on the neck.
>
> [Victim] testified that she could hardly walk. She had to have somebody help her shower, bathe, and that kind of thing. Think about the body cam when she's running around all over the place.
>
> I mean, the doctor at the stem cell center, she approached him, . . . he said she looked fine. There was nothing wrong with her. And she's alleging these serious injuries. I mean, common sense tells you she's not seriously injured.

> Forcible rape, kidnapping, we don't have that here.
>
>  . . .
>
> Ladies and gentlemen, [Defendant] is not guilty of kidnapping, and he's not guilty of a sexual offense of any kind. We'd ask that you find him not guilty. Thank you very much for your time.

Undoubtedly, Defense counsel only mentioned Defendant's charges for kidnapping and "sexual offense of any kind," omitting reference to Defendant's charge for assault on a female. Nevertheless, unlike the defendant's counsel in *McAllister*, defense counsel here never implied or mentioned any misconduct on behalf of Defendant. Instead, defense counsel, despite failing to specifically reference Defendant's assault charge, spent ample time making statements explicitly calling the jury's attention to the lack of evidence to support a conviction on such a charge and asked the jury, generally, to find Defendant not guilty. Thus, in viewing the entirety of defense counsel's statements in context, we hold those statements cannot logically be interpreted as an implied concession of Defendant's guilt.

We recognize Defendant further argues the trial court erred as it failed to conduct the required inquiry with Defendant to ensure he knowingly consented to defense counsel's concession of guilt. However, because we hold defense counsel did not concede guilt on behalf of Defendant, we hold the trial court was not required to conduct an inquiry and therefore did not err.

**B. Validity of the Indictment and the Trial Court's Jurisdiction**

Defendant contends the indictment was facially invalid as to the charge of habitual misdemeanor assault thereby divesting the trial court of jurisdiction. We disagree.

An indictment is a pleading which makes a formal accusation that the defendant has committed a crime. *See State v. Abbott*, 217 N.C. App. 614, 617, 720 S.E.2d 437, 439 (2011). The purpose of an indictment is, among other things, to provide the accused with notice of the offense with which he is charged. *See State v. Williams*, 368 N.C. 620, 623, 781 S.E.2d 268, 270–71 (2016); *see also State v. Greer*, 238 N.C. 325, 327, 77 S.E.2d 917, 919 (1953). Thus, our North Carolina General Statutes, section 15A-924(a)(5), requires an indictment contain:

> A plain and concise factual statement in each count which, . . . asserts facts supporting every element of a criminal offense and the defendant's commission thereof with sufficient precision clearly to apprise the defendant . . . of the conduct which is the subject of the accusation.

N.C. Gen. Stat. § 15A-924(a)(5) (2021). Where the indictment fails to do so, there is not a sufficient accusation against the defendant, the trial court acquires no jurisdiction, and any subsequent trial and conviction are a nullity. *See State v. Harris*, 219 N.C. App. 590, 593, 724 S.E.2d 633, 636 (2012) ("There can be no trial, conviction, or punishment for a crime without a formal and sufficient accusation." (internal marks and citation omitted)).

Here, Defendant argues the indictment failed to allege every element of the offense of habitual misdemeanor assault because count IV failed to state the assault

on a female caused "physical injury." However, habitual misdemeanor assault in violation of N.C. Gen. Stat. §14-33.2 was sufficiently alleged in counts V and VIII:

> V.     And the grand jurors for the state upon their oath present that on or about April 26, 2020, [ ] [D]efendant had been previously convicted of two or more felony or misdemeanor assaults, and the earlier of these convictions occurred no more than 15 years prior to the date of the current offense, to wit:
>
> > a. On or about July 31, 2011 [ ] [D]efendant did commit the assault of Assault on a Government Official/Employee in Wake County, North Carolina, and thereafter was convicted and judgment entered on August 22, 2011 in Wake County District Court (File No. 11 CR 217692).
> >
> > b. On or about July 31, 2011 [ ] [D]efendant did commit the assault of Assault on a Female in Wake County, North Carolina, and thereafter was convicted and judgment entered on August 22, 2011 in Wake County District Court (File No. 11 CR 217690).
>
>  . . .
>
> VIII.  And the grand jurors for the state upon their oath present that on or about April 26, 2020, in Wake County, [ ] [D]efendant named above unlawfully and willfully did assault and strike [victim] [ ], by hitting her shoulder, thereby inflicting serious injury. This act was done in violation of [N.C. Gen. Stat § 14-33.2].

Pursuant to N.C. Gen. Stat. §14-33.2, a defendant is guilty of habitual misdemeanor assault where he,

> violates any of the provisions of [N.C. Gen. Stat. § 14-33] and causes physical injury, or [N.C. Gen. Stat. §14-34], and has two or more prior convictions for either misdemeanor or felony assault, with the earlier of the two prior

convictions occurring no more than 15 years prior to the
date of the current violation.

N.C. Gen. Stat. § 14-33.2 (2021). Accordingly, the essential elements of habitual misdemeanor assault are, the defendant: (1) violates any of the provisions of N.C. Gen. Stat. § 14-33, (2) causes physical injury, and (3) has two or more prior convictions for misdemeanor or felony assault, with the earlier of the two occurring less than 15 years prior to the date of the current violation.

The indictment here included allegations concerning elements (1) and (3) of the offense of habitual misdemeanor assault. Defendant's two prior convictions were alleged in count V, and Defendant having violated the provisions of N.C. Gen. Stat. § 14-33, was alleged in count VIII (assault inflicting serious injury). Thus, we need only determine whether the indictment was sufficient as to element (2) of the habitual misdemeanor assault charge where count VIII stated Defendant inflicted "serious injury" rather than "physical injury," as prescribed in the statutory language of N.C. Gen. Stat. § 14-33.2.

In drawing an indictment, we recognize the "true and safe rule for prosecutors . . . is to follow strictly the precise wording of the statute." *State v. Sturdivant*, 304 N.C. 293, 310–11, 283 S.E.2d 719, 731 (1981) (internal marks and citations omitted). Nonetheless, our precedent makes clear "it is not the function of an indictment to bind the hands of the State with technical rules of pleading[.]" *Id.* at 311, 283 S.E.2d at 731; *see also In re J.U.*, 384 N.C. 618, 623, 887 S.E.2d 859, 863 (2023); *State v.*

*Jones*, 265 N.C. App. 644, 648, 829 S.E.2d 507, 510–11 (2019); *Williams*, 368 N.C. at 623, 781 S.E.2d at 270–71.

At common law, our courts were bound by strict, highly technical pleading standards which required specific evidentiary allegations to support each element. *See State v. Owen*, 5 N.C. 452, 464 (1810) (holding an indictment for murder, where the death was occasioned by a wound, was insufficient as it failed to describe the dimensions of the wound). However, our General Assembly has since enacted statutes intended to alleviate such technical pleading requirements. *See State v. Rankin*, 371 N.C. 885, 919, 821 S.E.2d 787, 810–11 (2018) (Martin, C.J., dissenting) (thoroughly recounting the history of criminal pleadings in North Carolina). Through such legislative reforms, North Carolina criminal law and procedure has "evolved from requiring elemental specificity to a more simplified requirement that indictments allege facts supporting each essential element of the charged offense." *In re J.U.*, 384 N.C. at 623, 887 S.E.2d at 863 (internal marks and citation omitted).

Today, our General Statutes provide, an indictment "is sufficient in form for all intents and purposes if it express[es] the charge against the defendant in a plain, intelligible, and explicit manner[.]" N.C. Gen. Stat. § 15-153 (2021). Further, section 15-153 states an indictment will not "be quashed, nor the judgment thereon stayed, by reason of any informality or refinement, if in the bill or proceeding, sufficient matter appears to enable the court to proceed to judgment." *Id.*

In considering the "serious injury" language used in count VIII above, we note,

our Court in *State v. Harris* stated, "an indictment for a statutory offense is sufficient, if the offense is charged in the words of the statute, either literally or substantially, or in equivalent words." 219 N.C. App. at 592–93, 724 S.E.2d at 636 (internal marks and citation omitted); *see also State v. Singleton*, 85 N.C. App. 123, 126, 354 S.E.2d 259, 262 (1987) ("An indictment couched in the language of the statute is generally sufficient to charge the statutory offense." (citation omitted)).  Similarly, our Supreme Court most recently stated, "[i]t is generally held that the language in a statutorily prescribed form of criminal pleading is sufficient if the act or omission is clearly set forth so that a person of common understanding may know what is intended."  *In re J.U.*, 384 N.C. at 624, 887 S.E.2d at 863 (internal marks and citation omitted).

Relevant here, our Courts have repeatedly applied a broad definition of serious injury—including within that definition both physical and mental injuries.  *See State v. Everhardt*, 326 N.C. 777, 781, 392 S.E.2d 391, 393 (1990) (holding a mental injury will support the element of serious injury under N.C. Gen. Stat. § 14-32); *State v. Demick*, 288 N.C. App. 415, 436, 886 S.E.2d 602, 618 (2023) (citing N.C. Gen. Stat. § 14-318.4, which defines serious physical injury to include physical and mental injuries).  Moreover, we note the purpose of an indictment is, among other things, to provide the defendant with notice of the offense with which he is charged, using language which would allow a person of common understanding to know what is intended, so that he may properly prepare for trial.  *See Williams*, 368 N.C. at 623, 781 S.E.2d at 270–71; *see also In re J.U.*, 384 N.C. at 624, 887 S.E.2d at 863.

Regardless of whether count VIII of the indictment used the broader, "serious injury" language, it logically follows Defendant was noticed of his need to defend against an allegation that he caused physical injury as "serious injury" is defined to include physical injury. Thus, in using "serious injury" rather than "physical injury" the indictment still served its purpose—to provide Defendant with notice of the offense with which he was charged, N.C. Gen. Stat. § 14-33.2.

North Carolina law shows a consistent trend away from the archaic and technical pleading requirements at common law. Thus, despite the use of the term "serious injury" rather than "physical injury" in the indictment, we hold the indictment was not facially invalid as it sufficiently noticed Defendant of the charges against him. Because the indictment was not facially invalid, the trial court was not deprived of jurisdiction.

### III. Conclusion

We hold Defendant was not denied any right guaranteed by the Sixth Amendment. Further, we hold the trial court maintained jurisdiction to sentence Defendant for habitual misdemeanor assault as the indictment was not facially invalid.

NO ERROR.

Judge CARPENTER concurs.

Judge MURPHY concurs in part and dissents in part by separate opinion.

No. COA22-280 – State v. Jackson

MURPHY, Judge, concurring in part and dissenting in part.

While I fully concur in the Majority's analysis of Defendant's *Harbison* argument, I respectfully dissent from its holding as to the sufficiency of the indictment. To be valid and thus confer jurisdiction to the trial court, a criminal indictment must allege every essential element of the charged offense. In limited circumstances, when one count in an indictment does not allege all essential elements, those elements may be imputed from a separate count in the indictment. Defendant appeals his conviction of habitual misdemeanor assault under N.C.G.S. § 14-33.2 on jurisdictional grounds on the basis that the indictment failed to allege "physical injury." In my view, Defendant was not properly indicted with habitual misdemeanor assault under N.C.G.S. § 14-33.2 due to the indictment's failure to allege the element of physical injury, either expressly or through supplementation. I would therefore vacate Defendant's habitual misdemeanor assault conviction and remand for a new sentencing hearing on Defendant's conviction for assault inflicting serious injury.

Defendant Curtis Levon Jackson appeals from convictions of second-degree forcible sex offense in violation of N.C.G.S. § 14-27.27, second-degree forcible rape in violation of N.C.G.S. § 14-27.22, first-degree kidnapping in violation of N.C.G.S. § 14-39, habitual misdemeanor assault in violation of N.C.G.S. § 14-33.2, assault with a deadly weapon in violation of N.C.G.S. § 14-33(C)(1), interfering with

emergency communication in violation of N.C.G.S. § 14-286.2, and assault inflicting serious injury against Tanya,[1] his ex-partner, in violation of N.C.G.S. § 14-33(C)(2).

In early March 2020, Tanya and Defendant met at a grocery store. Tanya gave Defendant her phone number. Thereafter, they began talking on the phone and spending time together on weekends at Defendant's house. The relationship started off well, but it soured in April 2020 when Tanya became pregnant, informed Defendant, and lost the baby a week and a half later. According to Tanya, things went "downhill real quick [sic]." Defendant exhibited the occasional "tantrum" and would take her belongings to keep her from leaving.

On 24 April 2020, Tanya told Defendant over the phone that she did not want to continue their relationship. That same day, she agreed to meet Defendant at his friend's house to talk. Defendant drove his roommate's car to his friend's house. When she arrived at the house, Defendant joined her in her truck. During their conversation, Defendant "got frustrated" over a phone call she received about an upcoming party. Tanya testified that "[Defendant] didn't want to sit there no more. He wanted to go [to] his place." When she refused to drive him to his place, Defendant grabbed her pocketbook, food, and keys; got back into his roommate's car; and drove away with her belongings.

Using her truck's spare key, Tanya followed Defendant to his house to

---

[1] I use a pseudonym to protect the identity of the victim and for ease of reading.

retrieve her belongings.  When she arrived, Defendant got inside of her truck, and the two argued.  Defendant took Tanya's spare key out of the truck's ignition, along with her pocketbook, food, phone, and first set of keys, and went into his room.  When Tanya followed Defendant into his room for her belongings, Defendant slapped her in the face, berated her, and refused to let her leave.

The next day, on 25 April 2020, Tanya drove Defendant to an appointment.  After his appointment, she and Defendant argued because she planned to attend a party later that evening.  Defendant, in response, took her keys and grabbed her gun to prevent her from leaving.  However,  Defendant returned both the keys and gun when Tanya threatened to call the police.

That night, Tanya attended the party.  Defendant repeatedly called and texted her while she was at the party, but she had blocked his phone number.  Defendant then called Tanya from her son's phone to speak with her.  Defendant complained to Tanya about hunger and back pain, threatening to show up at her home if she did not bring food to his house.  Eventually, Tanya agreed to take Defendant some food because she did not want Defendant to be around her children at home.  When Tanya arrived at Defendant's house, Defendant became agitated and requested that Tanya get off her phone so the two could engage in uninterrupted conversation.

Tanya turned her phone off as Defendant requested without "think[ing]

3

much of it." Defendant then "flipped" and announced he was "going to beat" Tanya. Defendant claimed to have "planned everything all the way up to this." Defendant seized Tanya's keys and phone and started swinging at her, slapping her face, and punching her arms while calling her names. Defendant also hit her with a broom handle, choked her, and put a pillow over her face. Defendant tried to damage her phone with a hammer but was unsuccessful. Defendant threatened Tanya not to call the police and raped and assaulted her several times from the night of 25 April 2020 until 8:00 am on 26 April 2020. Fearing Defendant would tie her up at his house if she did not join him, Tanya agreed to accompany Defendant to an appointment on the morning of 26 April 2020. After several attempts to get help, she successfully alerted a store clerk to call the police. Defendant was arrested shortly thereafter, and Tanya was transported to a nearby hospital for treatment of her injuries.

On 4 May 2020, Defendant was indicted for second-degree forcible sex offense, second-degree forcible rape, first-degree kidnapping, habitual misdemeanor assault, interfering with emergency communication, and assault with a deadly weapon inflicting serious injury ("AWDWISI"). The indictment alleged, in relevant part:

> IV. [] [T]he grand jurors for the [S]tate upon their oath present that on or about [26 April] 2020, in Wake County, [Defendant] unlawfully and willfully did assault and strike [Tanya], a female person. [Defendant] is a male

4

person and was at least 18 years of age when the assault occurred. This act was done in violation of N.C.G.S. § 14-33(c)(2).

V. And the grand jurors for the [S]tate upon their oath present that on or about [26 April] 2020, [Defendant] had been previously convicted of two or more felony or misdemeanor assaults, and the earlier of these convictions occurred no more than 15 years prior to the date of the current offense, to wit:

a. On or about [13 July 2011,] [Defendant] did commit the assault of Assault on a Government Official/Employee in Wake County, North Carolina, and thereafter was convicted and judgment entered on [22 August 2011] in Wake County District Court (File No. 11 CR 217692).

b. On or about [13 July 2011], [Defendant] did commit the assault of Assault on a Female in Wake County, North Carolina, and thereafter was convicted and judgment entered on [22 August 2011] in Wake County District Court (File No. 11 CR 217690).

. . . .

VIII. And the grand jurors for the [S]tate upon their oath present that on or about [26 April] 2020, in Wake County, [Defendant] unlawfully and willfully, did assault and strike [Tanya], by hitting her shoulder, thereby inflicting serious injury. This act was done in violation of N.C.G.S. § 14-33.2.

During trial, outside the presence of the jury, Defendant admitted that, prior to the date of his 25 April and 26 April 2020 assault charges against Tanya, he had been convicted of the crimes of assault on a government official and assault

on a female on 22 August 2011, as alleged in Count V.

Later in the proceedings, the trial court conducted a colloquy with Defendant, during which it informed Defendant about his rights to present evidence and testify. Defendant affirmed to the trial court that he understood and voluntarily elected not to testify. Defendant, however, noted his interest in presenting documentary evidence through his defense counsel. Defendant communicated some uncertainty about how to get a certain document admitted into evidence. The following conversation occurred:

> [DEFENDANT]: I wanted my attorney to present some evidence.
>
> [COURT]: All right. Now, as far as evidence, I don't want to get into any attorney-client privilege issues, but is it fair to say that you're asking to have someone else testify in this matter?
>
> [DEFENDANT]: Evidence is only someone testifying?
>
> [COURT]: No. But I'm inquiring, are you asking someone else to testify? That's the first question that I have.
>
> [DEFENDANT]: No, sir.
>
> [COURT]: All right. Now, are you – in reference to evidence, is it some type of documentation or some type of physical or tangible object that you wanted to present as evidence?
>
> [DEFENDANT]: Yeah, documentation.

*MURPHY, J., concurring in part and dissenting in part*

> [COURT]: All right.  Now, you've talked about this with
> your attorney, correct?
>
> [DEFENDANT]: Yes, sir.
>
> [COURT]: All right.  Your attorney has addressed with
> you the legal issues as far as any documentation is
> concerned?
>
> [DEFENDANT]: Legal issues as?
>
> [COURT]: About how it could be – if it can be admitted
> into evidence.
>
> [DEFENDANT]: I think –

The trial court clarified the necessary legal steps Defendant could take with the help of his counsel to ensure a document is appropriately admissible. Defendant communicated that he understood the trial court's explanations; however, right before the jury returned, he noted the following:

> [DEFENDANT]: I know we spoke about the evidence.  I
> mean, I just wanted to say that I did have evidence that—
> I didn't want to testify.  I did have evidence that I thought
> would help prove my innocence, and my attorney didn't
> think we should enter that evidence.
>
> . . . .
>
> And it wasn't that he didn't think we could get it in the
> court, he just didn't think we should enter it.  And I just
> wanted to state that on the record.

The trial court acknowledged the statement, and defense counsel did not

7

respond except to affirm that the defense was ready for the jury to return to the courtroom. Defendant did not present any evidence during the trial or make an offer of proof.

After the trial court provided its jury instructions, the State presented its closing argument, explaining every charge in turn, starting with the more severe crimes—second-degree rape, second-degree sex offense, and first-degree kidnapping—and ending with the "litany of assaults." Defense counsel, inter alia, argued in closing that "[Defendant] doesn't have to prove one single thing. . . . [The State] [has] to prove these charges beyond a reasonable doubt." Defense counsel began and ended his argument by discussing the "very serious crimes" that Defendant was charged with, i.e., "kidnapping[] [and] forcible rape." Defense counsel explained to the jury what the State's burden of proof was regarding the charges and challenged them to carefully evaluate the "stor[ies] [they] heard" and testimonies about Defendant's charges for contradictions. Additionally, defense counsel placed emphasis on the "very serious crimes" throughout his closing argument. The pattern of defense counsel's emphasis on the more serious crimes alleged by the State was as follows:

> [Defendant] is charged with some very serious crimes. I mean, kidnapping, forcible rape. Years and years and years in prison.
>
> . . . .

> Forcible rape, kidnapping, we don't have that here.
> Every element has to be satisfied.
>
> . . . .
>
> Ladies and gentlemen, [Defendant] is not guilty of
> kidnapping, and he's not guilty of a sexual offense of any
> kind. We'd ask that you find him not guilty.

The jury found Defendant guilty on all counts. The trial court arrested judgment on the assault inflicting serious injury conviction due to the habitual misdemeanor assault conviction.

Defendant argues that the indictment was facially invalid as to the habitual misdemeanor assault charge because it failed to allege that the charge on which Defendant claims the habitual misdemeanor assault was predicated, assault on a female, "caused physical injury."[2] Defendant contends that, absent the physical injury element, the trial court lacked subject matter jurisdiction to sentence Defendant for habitual misdemeanor assault.

"[W]here an indictment is alleged to be invalid on its face, thereby depriving the trial court of its [subject matter] jurisdiction, a challenge to that indictment may be made at any time," even for the first time on appeal. *State v. Wallace*, 351 N.C. 481, 503 (2000). We review whether the trial court had subject matter jurisdiction over the habitual misdemeanor assault charge de novo. *State v.*

---

[2] Physical injury is an essential element required for charging habitual misdemeanor assault under N.C.G.S. § 14-33.2. *See* N.C.G.S § 14-33.2 (2021); *see also State v. Garrison*, 225 N.C. App. 170, 172 (2013).

*Barnett*, 223 N.C. App. 65, 68 (2012).

To be valid and thus confer jurisdiction, N.C.G.S. § 15A-924(a)(5) requires that "an indictment charging a statutory offense must allege all of the essential elements of the charged offense." *Barnett*, 223 N.C. App. at 68 (citing *State v. Snyder*, 343 N.C. 61, 65 (1996)); *see also State v. Kelso*, 187 N.C. App. 718, 722 (2007) ("[A]n indictment must allege every element of an offense in order to confer subject matter jurisdiction on the court."), *disc. rev. denied*, 362 N.C. 367 (2008). "The sufficiency of an indictment is a question of law reviewed de novo." *State v. White*, 372 N.C. 248, 250 (2019).

A defendant is guilty of habitual misdemeanor assault if

> that person violates any of the provisions of [N.C.G.S.] § 14-33 and causes *physical injury*, or [N.C.G.S.] § 14-34, and has two or more prior convictions for either misdemeanor or felony assault, with the earlier of the two prior convictions occurring no more than 15 years prior to the date of the current violation.

N.C.G.S. § 14-33.2 (2021) (Emphasis added). Defendant challenges the validity of his indictment with respect to the habitual misdemeanor assault charge because the indictment did not allege that the assault on a female caused physical injury. Count IV of the indictment alleged that

> [Defendant] unlawfully and willfully did assault and strike [Tanya], a female person. [Defendant] is a male person and was at least 18 years of age when the assault occurred. This act was done in violation of N.C.G.S. § 14-33(c)(2).

Count V of the indictment alleged that

> [Defendant] had been previously convicted of two or more felony or misdemeanor assaults, and the earlier of these convictions occurred no more than 15 years prior to the date of the current offense[.]

Neither Count IV nor Count V contain language alleging that Defendant caused physical injury to Tanya. Thus, Defendant argues, the allegations in Count IV, describing the April 2020 offense, and Count V, describing his previous convictions, are insufficient to indict him for habitual misdemeanor assault.

In response, the State argues that the allegation of injury contained in Count VIII satisfies the physical injury element for the habitual misdemeanor assault charge. Count VIII of the indictment alleges that

> [Defendant] unlawfully and willfully, did assault and strike [Tanya], by hitting her shoulder, thereby inflicting *serious injury*. This act was done in violation of N.C.G.S. § 14-33.2.

(Emphasis added).

While I do not constrain my analysis of the sufficiency of Defendant's indictment to Counts IV and V, the allegation of "serious injury" in Count VIII is insufficient to satisfy the "physical injury" element for Defendant's habitual misdemeanor assault charge.

In *State v. Barnett*, the defendant was indicted for one count of assault on a female under N.C.G.S. § 14-33 and one count of habitual misdemeanor assault

11

under N.C.G.S. § 14-33.2. *State v. Barnett*, 245 N.C. App. 101, 111–12 (2016), *rev'd in part*, 369 N.C. 298 (2016). The defendant's first count, assault on a female, alleged "physical injury" to the victim; however, the allegations contained in his second count,

> which charged [the defendant] with habitual misdemeanor assault and properly referenced [the defendant's] two prior misdemeanor assaults that occurred less than 15 years prior to date of his current violation, did not include any language regarding [the defendant's] current charge of assault on a female resulting in a physical injury, a necessary showing for a [N.C.G.S.] § 14-33.2 violation.

*Id.* at 112. The defendant did not dispute the validity of his first count, which alleged assault on a female. *Id.* at 110. However, he "argued that the second count of the indictment fail[ed] to properly allege habitual misdemeanor assault because it did not include . . . a physical injury." *Id.* at 111. Although the count of habitual misdemeanor assault did not contain the physical injury element, we held that the defendant's indictment was sufficient. Defendant's first count, alleging assault on a female, alleged physical injury; therefore, we held that count one supplied the missing physical injury element of the count alleging habitual misdemeanor assault. *Id.* at 113–14. Thus, if an allegation of physical injury from the assault was alleged by the grand jury elsewhere in the indictment, we may impute this element to the otherwise defective allegation of habitual misdemeanor assault in

12

Count V.

Defendant correctly observes that, unlike in *Barnett*, Count IV (assault on a female) here did not include an allegation of physical injury. However, since we may supplement the missing element of physical injury from another part of the indictment, I continue my analysis to determine whether another count in the indictment alleged physical injury.

The State argues that "[C]ount VIII of the indictment sufficiently sets out the charge of habitual misdemeanor assault" because it "allege[s] an assault 'inflicting serious injury. . . .'" I disagree. Count VIII of the indictment provides, in pertinent part:

> [Defendant] unlawfully and willfully did assault and strike [Tanya], by hitting her shoulder, thereby *inflicting serious injury*. The act was done in violation of N.C.G.S. § 14-33.2.

(Emphasis added).

Count VIII alleged "serious injury" and not "physical injury" as required by N.C.G.S. § 14-33.2. We have observed that our Supreme Court "has not defined 'serious injury' for purposes of assault prosecutions, other than stating that 'the injury must be serious, but it must fall short of causing death' and that 'further definition seems neither wise nor desirable.'" *State v. McLean*, 211 N.C. App. 321, 325 (2011) (marks and citation omitted). In *State v. Everhardt*, we held that "[t]he term [']serious injury,' under [N.C.G.S.] § 14-32(b), means physical or bodily injury

13

resulting from an assault with a deadly weapon." *State v. Everhardt*, 96 N.C. App. 1, 12 (1989), *aff'd*, 326 N.C. 777 (1990). However, while not supplying a more limited definition, our Supreme Court rejected this more restrictive equivocation. Upon reviewing *Everhardt*, it held that the term "serious injury" may also encompass mental injury. *Everhardt*, 326 N.C. at 781 (holding that "mental injury will support the element of serious injury under N.C.G.S. § 14-32").

While *Everhardt* analyzed only N.C.G.S. § 14-32(b), we have also applied its definition of "serious injury" outside the § 14-32(b) context. *See, e.g.*, *State v. Lofton*, 193 N.C. App. 364, 374 (2008) (applying the broader understanding of "serious injury" discussed in *Everhardt* to N.C.G.S. § 14-32.1(e) and holding that "[b]ecause 'serious injury' may include serious mental injury . . . [defendant's] testimony regarding her mental state . . . is [] relevant"). As we have applied *Everhardt*'s broader definition of "serious injury" beyond N.C.G.S. § 14-32(b), we must also apply it here to reject the premise that "serious injury" only means "physical injury."

The State made no argument as to whether "physical injury" can be squarely defined within our caselaw's interpretation of "serious injury," but rather presupposes "serious injury" to be a viable substitute for "physical injury" for the

purposes of alleging habitual misdemeanor assault.[3]  Without more appearing on the face of the indictment, the State's implication that "physical injury" is *per se* alleged within the use of the phrase "serious injury" is not supported by the broader interpretation we must apply.

While our approach to evaluating indictments is to refrain from "hyper technical scrutiny with respect to form[,]" *In re S.R.S.*, 180 N.C. App. 151, 153 (2006), we must not abscond from our charge to apply governing caselaw and relevant statutory provisions where the General Assembly uses unambiguous language.  The unambiguous language of N.C.G.S. § 14-33.2 states that "[a] person commits the offense of habitual misdemeanor assault if that person violates any of the provisions of [N.C.G.S.] § 14-33 and causes *physical injury*[.]"  N.C.G.S. § 14-33.2 (2021) (emphasis added).  The broadening of the definition of "serious injury" to include both mental and physical injury established that serious injury is not synonymous with physical injury.  *Everhardt*, 326 N.C. at 781.  Count VIII of the indictment provides that Defendant "inflict[ed] serious injury" by striking and hitting Tanya on her shoulder.  However, the indictment alone cannot make the leap from "serious injury" to "physical injury."

Here, the essential element of "physical injury" was not sufficiently alleged

---

[3] The State also mentions Count VII in its brief, stating that "Count VII of the indictment alleges a charge of [N.C.G.S.] § 14-33(c)(1), assault with a deadly weapon."  However, it makes no further arguments about Count VII or how it supplements the "physical injury" element for a habitual misdemeanor assault charge.

in the indictment to satisfy a habitual misdemeanor assault charge. The grand jury failed to allege "physical injury" for the purposes of indicting Defendant for habitual misdemeanor assault pursuant to N.C.G.S. § 14-33.2. The defective indictment failed to confer the trial court with subject matter jurisdiction over the charge of habitual misdemeanor assault. Accordingly, I would vacate this conviction and remand for a new sentencing hearing on Defendant's conviction in file number 20 CRS 206791. *See Barnett*, 223 N.C. App. at 68 (marks omitted) (noting that the "[l]ack of jurisdiction in the trial court due to a fatally defective indictment requires the appellate court to arrest judgment or vacate any order entered without authority"). I therefore respectfully dissent from that portion of the Majority's opinion.